RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

### No. 13-2117

CHRYSLER GROUP LLC,

*Plaintiff-Appellee*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

*v.*

FOX HILLS MOTOR SALES, INC.; VILLAGE CHRYSLER
JEEP INCORPORATED; JIM MARSH AMERICAN
CORPORATION,

*Defendants-Appellants*.

### No. 13-2118

LIVONIA CHRYSLER JEEP, INC.,

*Plaintiff-Appellant*,

*v.*

CHRYSLER GROUP, LLC, et al.,

*Defendants-Appellees*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*.

### No. 13-2119

CHRYSLER GROUP LLC,

*Plaintiff-Appellee*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

*v.*

SOWELL AUTOMOTIVE, INCORPORATED, et al.,

*Defendants*,

SPITZER AUTOWORLD AKRON, LLC,

*Defendant-Appellee*,

FRED MARTIN MOTOR COMPANY,

*Defendant-Appellant*.

Nos. 13-2117/2118/2119

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:10-cv-12984; 2:10-cv-13290; 2:10-cv-13908—Sean F. Cox, District Judge.

Argued:  August 8, 2014

Decided and Filed:  January 16, 2015

Before:  ROGERS and GRIFFIN, Circuit Judges; VAN TATENHOVE, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**  Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Appellants in 13-2117.  Robert Charles Davis, DAVIS LISTMAN BRENNAN, Mt. Clemens, Michigan, for Appellant in 13-2118.  Jay F. McKirahan, COOPER & ELLIOTT, LLC, Columbus, Ohio, for Appellant in 13-2119.  Hugh Q. Gottschalk, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Appellee Chrysler Group in 13-2117 and 13-2118.  Katherine I. Twomey, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee in 13-2117, 13-2118, and 13-2119.  **ON BRIEF:**  Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., Eric R. Bowden, Michael J. O'Shaughnessy, COLOMBO & COLOMBO, P.C., Bloomfield Hills, Michigan, for Appellants in 13-2117.  Robert Charles Davis, DAVIS LISTMAN BRENNAN, Mt. Clemens, Michigan, for Appellant in 13-2118.  Jay F. McKirahan, COOPER & ELLIOTT, LLC, Columbus, Ohio, Lawrence R. Bach, RODERICK LINTON BELFANCE, LLP, Akron, Ohio, for Appellant in 13-2119.  Hugh Q. Gottschalk, Christopher P. Montville, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, John E. Berg, Cynthia M. Filipovich, CLARK HILL PLC, Detroit, Michigan, for Appellee Chrysler Group in 13-2117 and 13-2118.  Robert Y. Weller II, Kristen L. Baiardi, ABBOTT NICHOLSON, P.C., Detroit, Michigan, for Appellee Dick Scott in 13-2117.  Suanne Tiberio Trimmer, DAWDA, MANN, MULCAHY & SADLER, PLC, Bloomfield Hills, Michigan, for Prestige Chrysler Appellees in 13-2117 and 13-2118.  Anthony B. Giardini, ANTHONY B. GIARDINI CO., L.P.A., Lorain, Ohio, for Appellee Spitzer Autoworld in 13-2119.  Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee in 13-2117, 13-2118, and 13-2119.

———————————

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

ROGERS, Circuit Judge.   Congress—in Section 747 of the Consolidated Appropriations Act of 2010—created an arbitration procedure for automobile dealerships to seek continuation or reinstatement of franchise agreements that had been terminated by Chrysler during its bankruptcy proceedings, with the approval of the bankruptcy court.   This case involves what happens when the dealerships prevail, as some did, in their statutorily-provided arbitrations.

The lawsuit below involved numerous claims, counterclaims, and cross-claims by Chrysler and various dealers.   Among other things, the parties dispute the scope of relief provided for successful dealers under § 747, and whether such dealers are subject to state dealer protest laws that permit existing dealerships to protest the addition of a new dealer.   The district court correctly held that § 747 does not constitute an unconstitutional legislative reversal of a federal court judgment, and that the only relief provided to successful dealers under § 747 is the issuance of a "customary and usual" letter of intent.   The district court also properly found that the letters of intent at issue in this case were "customary and usual," with the exception of one contractual provision that requires reversal.   Contrary to the district court's conclusion, however, application of the state dealer acts of the two states in question (Michigan and Nevada) is preempted by § 747, because the state acts provide for redetermination of factors directly addressed in federally-mandated arbitrations closely related to a major federal government bailout.

**I.**

This case involves the post-bankruptcy corporate identity of Chrysler, the American automobile manufacturer.   The bankruptcy transferred almost all of the business from "Old Chrysler" to "New Chrysler," an entirely new corporate entity.[1]   Facing declining sales and an

---

[1]Previous courts have distinguished between an "Old Chrysler" (aka Chrysler LLC, the remains of which are now known as Old Carco LLC), which existed before its bankruptcy, and "New Chrysler" (aka Chrysler Group LLC), which was formed after Old Chrysler's insolvency and assumed nearly all of the prior company's ongoing business.  We follow this convention when the distinction is important.

overextended network of dealerships, Old Chrysler arrived at the brink of insolvency after the global financial crisis and filed for Chapter 11 bankruptcy in April 2009. *In re Chrysler LLC*, 405 B.R. 84, 87–88, 90 (Bankr. S.D.N.Y. 2009). Prior to the bankruptcy petition, Old Chrysler applied to and received from the federal government's Troubled Asset Relief Program ("TARP") a \$4 billion loan, which was given in exchange for a security interest in all of Old Chrysler's assets, to be held by the U.S. Treasury. *Id.* at 89–90; *see also* Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified at 12 U.S.C. § 5201 *et seq.*) (establishing TARP). After this loan, the federal government assumed a central role in Chrysler's restructuring. Beyond the Treasury's floating of considerable capital aid through TARP, the President of the United States instituted an Auto Task Force, whose goal was to negotiate a comprehensive restructuring among Chrysler and other affected parties. *In re Chrysler LLC*, 405 B.R. at 91. Eventually, the parties negotiated a plan with Fiat, the Italian automaker, which was willing and able to take up primary ownership of Chrysler's automobile empire. *See id.* at 91–92.

As part of the final sale order of the bankruptcy court, Old Chrysler sold, free and clear of all liens and encumbrances, nearly all of its assets to New Chrysler, which was owned predominantly by a voluntary employees' beneficiary association and partially by Fiat and various entities of the federal government, with Fiat maintaining the possibility of acquiring a majority ownership in the future. *Id.* at 92, 113. This asset transfer was conducted pursuant to 11 U.S.C. § 363(f), which creates a mechanism for a bankruptcy trustee to sell certain property of the debtor "free and clear of any interest in such property of an entity other than the estate."

In addition to transferring substantially all of Old Chrysler's assets to the new entity, the restructuring plan included some procedures designed to consolidate and streamline Old Chrysler's business operations. At the time of the bankruptcy petition, Old Chrysler had 32 manufacturing and assembly facilities and a network of 3,200 independent dealerships in the United States. *In re Chrysler LLC*, 405 B.R. at 88. Early in the bankruptcy proceedings, Old Chrysler filed a motion seeking to "reject executory contracts and unexpired leases affecting 789 domestic car dealerships," that is, requesting permission to terminate its sales and service

agreements with 789 dealers.  *See id.*  That request represented the elimination of nearly a quarter of Chrysler's dealerships in the United States.

In response to the upheaval in the American automobile industry—which was said to threaten almost 2,000 dealerships nationwide and put nearly 100,000 jobs at risk—the United States Senate held a special hearing on June 3, 2009, to address the issue of dealership closures. *GM and Chrysler Dealership Closures: Protecting Dealers and Consumers: Hearing Before the S. Comm. on Commerce, Sci. & Transp.*, 111th. Cong. (2009) ("Senate Hearing").  One senator at the hearing expressed concern that "[w]e committed an awful lot of taxpayer money to try to save all those jobs that are now being cut," while the cause of the problem was that the automobile manufacturers were stubbornly refusing to innovate in the marketplace. *See id.* at 85 (statement of Sen. Bill Nelson).  One senator stated that "because of this financial investment, we have an obligation to ensure Federal resources are being used wisely and fairly and in the best interests of the taxpayers." *Id.* at 20 (statement of Sen. John Thune).[2]

During the hearing, James Press, the Vice Chairman and President of Old Chrysler, responded that the dealership terminations were necessary for the survival of New Chrysler.  He pointed out that the average Chrysler dealer lost over $3,000 annually and that the existence of "a legacy of dealers that sell only one or two of the company's three brands—Chrysler, Jeep and Dodge— . . . led to redundancies and inefficiencies in product development and marketing costs." *Id.* at 28–29.  Press outlined Chrysler's plan to streamline their dealership network:

> Chrysler has consistently communicated the need for a consolidation of dealers to our network.  Our most recent restructuring effort, Project Genesis, is aimed at bringing all three brands under one roof to go along with our plan to produce fewer products that overlap.  Genesis was launched in 2008 with an extensive communication plan including a series of meetings across the United States with our dealers and presentations at the National Auto Dealers Association annual conference.  In each market, we identified the optimal number of dealers and locations and we began working collaboratively to build a healthy and profitable network.

---

[2]As of July 2010, the U.S. Treasury had committed $80.7 billion to GM and Chrysler under TARP's Automotive Industry Financing Program.  Office of the Special Inspector General for TARP, *Factors Affecting the Decisions of General Motors and Chrysler to Reduce Their Dealership Networks*, SIGTARP-10-008, at 2 (July 19, 2010) ("SIGTARP Report").  This SIGTARP Report on the dealership closures was initiated after "Senator Jay Rockefeller sent a letter to SIGTARP noting that the hearing demonstrated substantial confusion, even amongst dealers, as to how GM and Chrysler selected dealerships for termination and what benefit, if any, the companies gained from terminating the dealerships." *Id.* at 1.

*Id.* at 30; *see also In re Old Carco LLC*, 406 B.R. 180, 193–95 (Bankr. S.D.N.Y. 2009) (describing Project Genesis). Chrysler determined which dealerships would be targeted for termination based on an analysis of certain factors, including: total sales potential for the market, each dealer's record of meeting sales and operational targets, the modernity of the dealer's physical facilities, the location of the dealership with respect to "optimum retail growth area," and "[e]xclusive representation within larger markets." Senate Hearing at 31. As part of Project Genesis, 84 percent of the remaining dealers would carry all three of Chrysler's brands, compared to 62 percent prior to consolidation. *Id.* Congress did not take any action at that time.

The bankruptcy court overseeing the Chrysler restructuring eventually authorized the dealership rejections. *In re Old Carco LLC*, 406 B.R. at 186–87. The authorization of the rejections was made under the authority of § 365 of the Bankruptcy Code, which provides that, with limited exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). When authorizing the rejection of the rejected dealers' sales and service agreements, the bankruptcy court applied the business judgment standard, opting not to employ a higher standard despite the presence of state and federal statutes that protected auto dealerships from being terminated without good cause. *See In re Old Carco LLC*, 406 B.R. at 187–93; *see also In re Penn Traffic Co.*, 524 F.3d 373, 382–83 (2d Cir. 2008) (discussing § 365's business judgment standard). Applying the business judgment standard, the bankruptcy court ratified Chrysler's decision to reject its executory contracts with the dealers it desired to eliminate, reasoning that "rejection . . . was necessary and appropriate" for the new company's business plans to the extent that it "enable[d] the Debtors to consummate the Fiat Transaction and transfer to New Chrysler a smaller, more effective, and more profitable dealer network without disruption." *In re Old Carco LLC*, 406 B.R. at 195. The bankruptcy court also held that § 365 of the Bankruptcy Code, as applied in this instance, preempted state laws that provided rights and remedies related to the termination of dealership agreements. *Id.* at 199–201.

Although earlier legislative attempts to protect the interests of the rejected auto dealers did not go anywhere,[3] § 747, out of which this entire dispute arises, was inserted at the eleventh hour into an omnibus appropriations bill. Consolidated Appropriations Act of 2010, § 747, Pub. L. No. 111-117, 123 Stat. 3034, 3219–21. Section 747 was intended to "establish[] a disclosure and arbitration process to determine whether dealers that had their franchise agreements terminated or not assumed by a successor company should be added to dealer networks of automobile manufacturers partially owned by the Federal Government." H.R. Rep. No. 111-366, at 942 (2009) (Conf. Rep.). This provision defines a "covered manufacturer" in two separate ways, one of which was intended to cover New Chrysler: "an automobile manufacturer which acquired more than half of the assets of an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance under title I of the Emergency Economic Stabilization Act of 2008." § 747(a)(1)(B), 123 Stat. at 3220. Subsection (b) of the provision creates an arbitration right for dealerships terminated during the bankruptcy:

> A covered dealership that was not lawfully terminated under applicable State law on or before April 29, 2009, shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued. Such continuation, reinstatement, or addition shall be limited to each brand owned and manufactured by the covered manufacturer at the time the arbitration commences, to the extent that the covered dealership had been a dealer for such brand at the time such dealer's franchise agreement was terminated, not assigned, not renewed, or not continued.

---

[3]Some members of Congress acted in response to the dealership terminations. In early June 2009, two bills were proposed, in the Senate and the House separately, that were intended to protect the dealerships targeted for termination, and provide them with a right of restoration. In particular, the Senate version of the bill would have provided:

> [A]t the request of an automobile dealer, an automobile manufacturer covered under this section shall restore the franchise agreement between that automobile dealer and Chrysler LLC . . . that was in effect prior to the commencement of [its] . . . bankruptcy case[] and take assignment of such agreements.

S. 1304, 111th Cong. § 2(b)(2) (2009). The House bill was substantively identical. *See* H.R. 2743, 111th Cong. § 3(b) (2009).

These bills did not pass either chamber. In July, another measure, which would have allowed dealerships terminated during the bankruptcy "to enter into a new dealer agreement . . . on the same terms as existed immediately before" the termination, passed in the House of Representatives, attached to an appropriations act. H.R. 3170, 111th Cong. § 745(b) (2009). The Senate never passed that version of the bill.

§ 747(b), 123 Stat. at 3220.  Subsection (d) establishes the procedure to be followed during the arbitration.  In particular, it commands the arbitrator to

> balance the economic interest of the covered dealership, the economic interest of the covered manufacturer, and the economic interest of the public at large and . . . decide, based on that balancing, whether or not the covered dealership should be added to the dealer network of the covered manufacturer.

§ 747(d), 123 Stat. at 3220.[4]  The arbitrator must then submit a written determination that includes an "explanation of how the balance of economic interests supports the arbitrator's determination" and "a clear statement indicating whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer."  *Id.*, 123 Stat. at 3221.  Subsection (e) lays out a method for the selection of the arbitrator, establishes discovery techniques, and provides for other administrative details.  Most importantly for this case, subsection (e) provides for the following relief when the arbitrator finds in favor of one of the rejected dealerships:

> [T]he covered manufacturer shall as soon as practicable, but not later than 7 business days after receipt of the arbitrator's determination, provide the dealer a customary and usual letter of intent to enter into a sales and service agreement. After executing the sales and service agreement and successfully completing the operational prerequisites set forth therein, a covered dealership shall return to the covered manufacturer any financial compensation provided by the covered manufacturer in consideration of the covered manufacturer's initial determination to terminate, not renew, not assign or not assume the covered dealership's applicable franchise agreement.

§ 747(e), 123 Stat. at 3221.  A letter of intent is a contract that precedes a full sales and service agreement, the final contractual arrangement between a manufacturer and a dealer that provides the dealership with the right to sell certain makes of automobiles produced by the manufacturer.

---

[4]Section 747(d) also provides that:

The factors considered by the arbitrator shall include (1) the covered dealership's profitability in 2006, 2007, 2008, and 2009, (2) the covered manufacturer's overall business plan, (3) the covered dealership's current economic viability, (4) the covered dealership's satisfaction of the performance objectives established pursuant to the applicable franchise agreement, (5) the demographic and geographic characteristics of the covered dealership's market territory, (6) the covered dealership's performance in relation to the criteria used by the covered manufacturer to terminate, not renew, not assume or not assign the covered dealership's franchise agreement, and (7) the length of experience of the covered dealership.

§ 747(d), 123 Stat. at 3220–21.

A number of the terminated dealers sought arbitration against New Chrysler under § 747. Out of over 400 former dealers who elected to arbitrate, Chrysler prevailed in 76 arbitrations, the dealer prevailed in 32 arbitrations, and the remaining disputes were settled through other means. *Chrysler Grp. LLC v. S. Holland Dodge, Inc.*, 862 F. Supp. 2d 661, 670 n.3 (E.D. Mich. 2012). Of the hundreds of dealerships that were rejected pursuant to the bankruptcy court's order, five are currently parties to this appeal: Fox Hills Motor Sales, Inc., d/b/a Fox Hills Chrysler Jeep, which had been authorized to sell Chrysler and Jeep vehicles in Plymouth, Michigan; Village Chrysler Jeep, Inc., d/b/a Village Automotive Center, which had been authorized to sell Chrysler and Jeep vehicles in Royal Oak, Michigan; Jim Marsh American Corporation, d/b/a Jim Marsh Chrysler-Jeep, which had been authorized to sell Chrysler and Jeep vehicles in Las Vegas, Nevada; Livonia Chrysler Jeep, Inc., which had been authorized to sell Chryslers and Jeeps in Livonia, Michigan; and Spitzer Autoworld Akron, LLC, which had been authorized to sell Chrysler, Jeep, and Dodge vehicles in Akron, Ohio. Fox Hills, Village, Jim Marsh, Livonia, and Spitzer were among those dealers that prevailed, and each of the written arbitration determinations ordered Chrysler to offer a letter of intent or to renew and assume the dealership "in the manner provided for by the Act and in accordance with the terms and conditions of the Act." *Id.* at 670–71 (quoting the determinations). Chrysler issued letters of intent to the prevailing dealers. Many of the dealers who received these letters feared that they would be unable to meet the conditions imposed by Chrysler or that their reentry would be prevented by existing dealers' protests brought under state dealer laws. *See id.*

During the pendency of the arbitration, New Chrysler allegedly installed "like-line" dealers in the same vicinities as some of the rejected dealers that were pursuing reinstatement through § 747 arbitration. For example, the arbitrator in the Village arbitration noted: "Since terminating Village in June 2009, Chrysler has extended its Genesis plan to a dealer ("Suburban") at the Troy Motor Mall within a very close sales radius of Village. Suburban now sells all three brands . . . ." Chrysler similarly issued to an existing dealer near Fox Hills a letter of intent to become a "3 in 1" dealer.

Disagreement about what the § 747 arbitration orders entailed led almost immediately to the present litigation. This appeal arises out of three separate actions that were consolidated in

the district court.  In two separate complaints against various prevailing dealers, Chrysler sought declaratory relief, requesting that the court declare that "1) Section 747 does not preempt state dealer acts; 2) the [letters of intent] provided by New Chrysler are customary and usual within the meaning of Section 747; and 3) a [letter of intent] is the sole and exclusive remedy under Section 747." *Id.* at 672.  An independent complaint filed by Livonia and counter-complaints filed by other prevailing dealers named in Chrysler's complaint all asserted various claims for declaratory, injunctive, and monetary relief. *Id.* at 672–73.  Essentially, the rejected dealers that prevailed at arbitration claimed, with some variation, that § 747 preempted state dealer laws to the extent that existing dealers could prevent their reintroduction to the dealership networks, that Chrysler's letters of intent were not customary and usual, and that Chrysler owed the dealers monetary compensation for violating § 747.  Some existing like-line dealerships, those who could potentially compete with the rejected dealerships were they to be reinstated, were named in Chrysler's original complaints.  Some of them, including Fred Martin, filed cross-claims seeking a declaration that § 747 is invalid and unconstitutional, or in the alternative, that § 747 does not preempt the state dealer protest laws that grant such existing dealerships certain rights to protest the installation of competing dealerships in the same vicinity. *Id.* at 672.

A flurry of dispositive motions ensued, requesting declaratory relief along the lines of the claims outlined above. *Id.* at 673–75 (listing fifteen).  When two of the parties raised constitutional challenges—Chrysler argued that the constitutional avoidance doctrine warranted a narrow construction, and Fred Martin argued that the act was unconstitutional under any construction—the United States Government intervened to defend the constitutionality of § 747.

In a lengthy opinion, the district court construed § 747 and addressed the constitutional issues raised by the parties.  First, the court rejected the claims for any monetary damages by holding that "under the plain language of the Act, the sole and exclusive remedy for a dealer rejected by Old Chrysler who prevails in a Section 747 arbitration with New Chrysler is a customary and usual letter of intent to enter into a sales and service agreement with New Chrysler." *Id.* at 676, 678.  Next, the court construed the remedy provided under § 747, holding that § 747 does not provide for unconditional "reinstatement," as argued by some of the prevailing dealers. *Id.* at 678.  The court reasoned that subsection (e) explicitly required only

that Chrysler issue a "customary and usual letter of intent"; and that subsection (b)'s reference to "reinstatement" and "continuation" applied only to General Motors, which terminated dealers not through rejection of the contracts during the asset sale, as had New Chrysler, but rather through deferred termination agreements that were assumed by the new post-bankruptcy entity. *Id.* at 676–77. The court also declined to "confirm and/or enforce the[] arbitration awards," reasoning that § 747 did not authorize such a remedy and that the Federal Arbitration Act, which permits judicial confirmation, does not apply to a statutorily mandated, as opposed to voluntary, arbitration. *Id.* at 678–80. Considering the more explicit reinstatement remedies in the proposed bills that were rejected in the House and Senate and emphasizing the sparseness of the remedy that was actually passed by Congress, the district court also concluded that § 747 does not preempt state dealer laws. *Id.* at 682. Finally, the court noted that its rulings did not entirely dispose of all of the actions and that the next appropriate step would be to hold a status conference in order to determine the most efficient method of adjudicating the remaining claims, including the issue of whether Chrysler provided the prevailing dealers with "the statutory customary and usual letter of intent to enter into franchise agreements." *Id.* at 683 (citing *Eagle Auto Mall Corp. v. Chrysler Grp., LLC*, No. CV 10-3876, 2011 WL 6754087 (E.D.N.Y. Dec. 23, 2011) (proceeding to trial on same issue)).

Some of the parties appealed, but we remanded because the district court's preliminary rulings did not amount to a final judgment, and the appeal was therefore premature. *See* Order, *Chrysler Grp., LLC v. Jim Marsh Am. Corp.*, No. 12-1468 (6th Cir. June 27, 2012); Order, *Chrysler Grp., LLC v. Fred Martin Motor Co.*, No. 12-1507 (6th Cir. June 27, 2012).

At the bench trial, the district court denied Fred Martin's motion for a separate trial, which Fred Martin argued was justified because it was seeking a declaratory judgment that § 747 is unconstitutional regardless of the court's earlier narrow construction of the remedy. *Chrysler Grp. LLC v. S. Holland Dodge, Inc.*, Nos. 10-12984, 10-13290, 10-13908, 2013 WL 1499138, at *3 (E.D. Mich. Apr. 11, 2013). The court adopted the Government's reasoning that any constitutional issue had already been resolved by the court's interpretation of § 747 and that Fred Martin lacked standing to bring the claim. *Id.* at *2. On the same day, the district court issued a pre-trial order clarifying that the "customary and usual" standard would be determined by

comparing the prevailing dealers' letters of intent to a "relevant universe" of letters of intent. The court adopted the reasoning of the Eastern District of New York in *Eagle Auto Mall Corp.*, 2011 WL 6754087, and the Central District of California in *Los Feliz Ford, Inc. v. Chrysler Group, LLC*, No. 10-6077 (C.D. Cal. Apr. 9, 2012), and defined the "relevant universe" as the letters of intent issued by New Chrysler (not Old Chrysler) to new dealer candidates through July 2010, when the last of the disputed letters of intent was issued.

The district court held a bench trial on July 9, 2013, to determine whether Chrysler supplied each dealer that had prevailed at arbitration with a "customary and usual letter of intent," as required by the statute. *Chrysler Grp. LLC v. S. Holland Dodge, Inc.*, Nos. 10-12984, 10-13290, 10-13908, 2013 WL 3817408 (E.D. Mich. July 23, 2013). By this time, most of the rejected dealers involved in the case had reached settlements with New Chrysler, and the only rejected dealers whose letters of intent were in dispute were Fox Hill, Village, Jim Marsh, and Livonia. *Id.* at *5 & n.1. The evidence at the bench trial consisted of: 122 letters of intent that New Chrysler had issued to new dealer candidates between June 9, 2009 (the effective date of New Chrysler assuming Old Chrysler's business) and July 31, 2010; a joint exhibit spreadsheet tracking various provisions in each of the 122 letters of intent; and the testimony of one witness, Chrysler's National Dealer Placement Manager from before the bankruptcy through the relevant periods after the § 747 arbitrations. *Id.* at *5–6.

The district court determined that all of the remaining rejected dealers had received "customary and usual" letters of intent. *Id.* at *8. First, the court used English language dictionaries, *Black's Law Dictionary*, and the federal Medicare regulations to define "customary" and "usual" in this context as "substantially the same [as] found in a majority" of the relevant universe of comparison letters of intent. *Id.* at *7. Applying this definition, the court found that "[t]he Rejected Dealers have failed to present evidence that any of the terms in their [letters of intent] were not included in at least the majority" of the relevant universe of issued letters of intent, and the court accordingly entered judgment in Chrysler's favor. *Id.* at *8.

This appeal followed. Three separate appeals were consolidated.

Four of the terminated dealers appeal in two separate appeals. In appeal number 13-2117, three of them—Fox Hills, Village, and Jim Marsh—filed a consolidated appellants' brief

arguing that § 747 preempts state dealer laws and that, in any event, the district court erred in defining the "relevant universe" of letters of intent when determining whether their letters of intent were "customary and usual."  In appeal number 13-2118, another terminated dealer, Livonia, appealed, arguing that § 747's remedy is unconditional reinstatement, that state dealer protest laws are preempted, and that, in any event, Chrysler's letter of intent to Livonia was not "customary and usual."

In appeal number 13-2119, one of the existing like-line dealers, Fred Martin, argues that the district court erred by not considering its constitutional challenge.  Fred Martin contends that (1) it has standing to raise the issue, and (2) § 747 runs afoul of separation-of-powers principles by reopening the bankruptcy court's final judgment.  In response, Spitzer Autoworld, a prevailing dealer in Fred Martin's relevant market area, defended § 747's constitutionality and claimed that Fred Martin lacked standing to raise a constitutional challenge to the act.  Unlike the other prevailing dealers, Spitzer does not challenge the state dealer protest laws.

The Government intervened to defend the constitutionality of § 747.

## II.

The district court properly concluded that § 747 does not entitle prevailing dealers to unconditional "reinstatement,"[5] but requires only that Chrysler issue the typical letter of intent, legally enforceable as a contract entered into in good faith.  The plain language of the act compels this conclusion.  Such a remedy is, moreover, far from illusory.  In accordance with Congress's aim to reintroduce prevailing dealers back into the manufacturers' dealership networks, prevailing dealers obtain something substantial that they otherwise would lack— contractual entitlement—to the extent that they meet the operational prerequisites of a customary and usual letter of intent.

A customary and usual letter of intent is the sole remedy provided for a prevailing dealer under § 747.  A close examination of the statutory language of § 747 shows that the statute contemplates that Chrysler's only immediate obligation after a positive arbitration is to issue a

---

[5]Only Livonia contends that prevailing dealerships are entitled to unconditional "reinstatement."  The other prevailing dealerships appear to concede that a "customary and usual letter of intent" is the only available remedy, although they argue that state dealer protest laws are preempted insofar as they may prevent a letter of intent from ripening into a full sales and service agreement.

letter of intent.  Subsection (e) provides that within seven days of an arbitration decision in favor of the rejected dealer, Chrysler "shall . . . provide the dealer a *customary and usual letter of intent* to enter into a sales and service agreement."  § 747(e) (emphasis added).  In matters of statutory interpretation, where this court must discern Congress's intended meaning, we must start with the language itself.  *E.g.*, *Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 371 (6th Cir. 2007).  Our interpretation of § 747 accords with those of other circuits, as no circuit has held that § 747 requires unconditional reinstatement.  *See Eagle Auto Mall Corp. v. Chrysler Grp., LLC*, 550 F. App'x 69, 69−70 (2d Cir. 2014); *Los Feliz Ford, Inc. v. Chrysler Grp., LLC*, 571 F. App'x 546, 547 (9th Cir. 2014).

Livonia points to two phrases from § 747 that could be read to suggest that prevailing dealers are entitled to unconditional, no-strings-attached "reinstatement": subsection (b)'s statement that the rejected dealers "have the right to seek, through binding arbitration, *continuation, or reinstatement of a franchise agreement, or to be added as a franchisee*," and subsection (d)'s statement that the arbitrator "shall decide . . . whether or not the covered dealership *should be added to the dealer network* of the covered manufacturer."  § 747(b), (d) (emphases added).  Far from mandating unconditional reinstatement, however, these provisions simply imply that the remedy should meaningfully facilitate incorporation of prevailing dealerships back into the network.  Congress's chosen remedy—the letter of intent—does just that.  A letter of intent is a binding contract to enter into a sales and service agreement, that is, a contract to be added to the dealer network, or "reinstated."  As New Chrysler's National Dealer Placement Manager testified at the bench trial, after receiving a letter of intent, "the dealer candidate ha[s] contractual certainty that if they meet the requirements they will, in fact, get a sales and service agreement . . . [a]bsolutely."**[6]**

### III.

Section 747 also preempts the state dealer protest laws in Nevada and Michigan.  Although Congress stopped short of mandating unconditional reinstatement, Congress did intend to provide a substantial and meaningful remedy, one that would grant prevailing dealers

---

**[6]**We do not rely on Chrysler's argument, accepted by the district court, that reinstatement is not required because the use of the specific term "reinstatement" in § 747(b) was intended to cover only GM dealerships that had been a part of deferred termination agreements. *See  Chrysler Grp.*, 862 F. Supp. 2d at 677.

"contractual certainty" that a sales and service agreement would be forthcoming, so long as customary and usual operational requirements were met. To that end, Congress intended for the arbitrator's decision to be the final and preclusive determination of whether there exists good cause for the terminated dealers to resume dealing in Chrysler vehicles. State dealer protest laws—like those in Nevada and Michigan[7]—that would permit state officials to enjoin the reintroduction of a prevailing dealership based on a second, parallel determination regarding good cause are thus preempted by § 747.

Section 747 preempts such state dealer protest laws because they stand as an obstacle to Congress's aim to provide a substantial and meaningful remedy to prevailing dealers. Conflict preemption occurs when a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583−84 (6th Cir. 2013). In other words, "[i]f the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress." *Savage v. Jones*, 225 U.S. 501, 533 (1912).

Michigan's and Nevada's state dealer protest laws, in particular, frustrate Congress's purpose in enacting § 747 because they permit state officials to delay and possibly nullify the effect of federal arbitration. Congress intended the federal arbitration to determine whether there is good cause for a terminated dealer to be added to New Chrysler's dealer networks. To that end, Congress placed within the discretion of the arbitrator the decision of "whether the franchise agreement at issue is to be renewed, continued, assigned or assumed by the covered manufacturer." § 747(d). State dealer protest laws create a process by which a state official subsequently and independently determines whether there is good cause for the new dealerships to have a sales and service agreement. This second, parallel determination of good cause impermissibly grants state officials the power to review the federal arbitral decisions. In an

---

[7]Fox Hills, Village, Jim Marsh and Livonia all argue in favor of preemption. Because these dealerships are located in Nevada and Michigan, we consider their preemption arguments under the laws of those states. Spitzer, on the other hand, does not challenge the state dealer protest laws in its home state of Ohio, a point conceded by its attorney at oral argument. Accordingly, we do not consider the preemption argument with respect to Ohio state dealer protest laws.

analogous case, involving whether a non-lawyer could practice before the United States Patent Office, the Supreme Court reasoned that

> [a] State may not enforce licensing requirements which, though valid in the absence of federal regulation, give "the State's licensing board a virtual power of review over the federal determination" that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress. "No State law can hinder or obstruct the free use of a license granted under an act of Congress."

*Sperry v. Florida*, 373 U.S. 379, 385 (1963) (relying in part on *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) (internal citations omitted)).

Regardless of the intent of an auto manufacturer in tendering a letter of intent to a prospective dealer, state dealer protest laws give existing auto dealerships certain rights to prevent the entry of dealerships that could compete with them. The Michigan and Nevada dealer protest laws[8] protect existing dealers from competition by providing a process by which the auto manufacturers must demonstrate "good cause" in order to create a new dealership within a certain proximity of an existing dealership. Under both systems, whenever a proposed new like-line dealership[9] enters into the "relevant market area" of an existing dealership,[10] the existing dealership may lodge a protest with the relevant state official.[11] The state official—a court in Michigan, an administrative official in Nevada—determines whether "good cause" exists for establishing the new dealership. Mich. Comp. Laws § 445.1576(5); Nev. Rev. Stat.

---

[8]These are only one aspect of a whole range of regulations designed to protect the interests of auto dealerships and regulate the relationship between dealerships and manufacturers, as well as the sale of motor vehicles generally. *See* Mich. Comp. Laws § 445.1561 *et seq.*; Nev. Rev. Stat. § 482.318 *et seq.*; *see generally New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100–03 (describing state dealer laws generally and California's in particular). The prevailing dealerships do not challenge any other part of these comprehensive state regulatory schemes.

[9]Both statutes only give protest rights to those existing dealerships that sell vehicles of the same "line make" (the "brand") as the proposed dealership. Mich. Comp. Laws § 445.1576(2); Nev. Rev. Stat. § 482.36357(1). They also apply equally to new dealerships and dealerships that are relocating to a new location. Mich. Comp. Laws § 445.1576(2); Nev. Rev. Stat. § 482.36357(1).

[10]In Michigan, this is the area within a 9-mile or 15-mile radius of the existing dealership, depending on the population of the county in which the new dealership will be located. Mich. Comp. Laws § 445.1566(1). In Nevada, it is an area within a 10-mile radius of an existing dealer that sells vehicles of the same line and make. Nev. Rev. Stat. § 482.3634.

[11]In Michigan, the existing dealership must bring an action for a declaratory judgment in circuit court within 30 days of receiving written notice of the manufacturer's intention to establish the new dealership. Mich. Comp. Laws § 445.1576(3). In Nevada, an existing dealer has 15 days after notice to file a protest with the Director of the Department of Motor Vehicles. Nev. Rev. Stat. § 482.36357(1)(b).

§ 482.36357(1)(b)(2). The Michigan statute instructs the court, in its determination of "good cause," to consider a non-exclusive list of seven factors, including "[w]hether it is injurious or beneficial to the public welfare" and the "[e]ffect on the retail new motor vehicle business and the consuming public in the relevant market area." Mich. Comp. Laws § 445.1576(5), (5)(b), (c). The Nevada statute does not provide much guidance on what constitutes "good cause," but it includes "the economic effect of the proposed action upon the protesting dealer." Nev. Rev. Stat. § 482.36363(2). Upon a finding of no good cause, the new dealership is prohibited from operating.

A side-by-side comparison of the Michigan statute's "good cause" factors and § 747(d)'s factors demonstrates that the determinations are substantially similar. The similarity starts with the characterization of the determination: "whether or not the covered dealership *should be added* to the dealer network," § 747(d) (emphasis added), is not meaningfully different from "whether *good cause exists for establishing* . . . an additional new motor vehicle dealer," Mich. Comp. Laws § 445.1576(5). On the most general level, both analyses weigh the effect of the new dealership on "the public welfare," Mich. Comp. Laws § 445.1576(5)(c), or "the public at large," § 747(d). Similarly, they both consider the effect of the decision on the dealer, although Michigan does this only for relocating dealers—which face a situation more akin to the terminated dealers in this case that are attempting to reopen operations. *See* Mich. Comp. Laws § 445.1576(5)(g). Next, both inquiries consider how longstanding is the proposed franchisee's commitment: Michigan law has the decisionmaker look at the "[p]ermanency of the investment," *id.* § 445.1576(5)(a),[12] while the federal arbitrator must similarly consider "the length of experience of the covered dealership," § 747(d). Both inquiries analyze the competitive qualifications of the petitioning dealership in relation to the existing consumer market. The Michigan court does this by weighing the "[e]ffect on the retail new motor vehicle business and the consuming public in the relevant market area," "[w]hether the [existing dealers] are

---

[12]Chrysler suggests that this factor considers "the *existing dealership's* investments." However, this interpretation of the permanency-of-investment factor is neither required by the statutory language—which does not specify whose investment is considered—nor supported by Michigan case law. A search of the case law revealed only one published Michigan case that discussed the factor. In that case, the appellate court held that the trial court's finding that a relocation represented a permanent investment was clearly supported by the evidence, where the relocating dealer was relocating to a modern facility, was transferring equity to the new facility, and was obtaining more capital from the manufacturer to refinance the relocation. *See McDonald Ford Sales, Inc. v. Ford Motor Co.*, 418 N.W.2d 716, 718 (Mich. Ct. App. 1987).

providing adequate competition and convenient consumer care," and "[w]hether the establishment or relocation of the new motor vehicle dealer would promote competition," Mich. Comp. Laws § 445.1576(5)(b), (d), (e). The federal arbitrator does it by weighing such factors as the covered dealership's historic profitability, its overall business plan, and its current economic viability, as well as its satisfaction of the prior franchise agreement's performance objectives. § 747(d). Finally, both analyses consider relevant demographic and geographic characteristics of the relevant market area. *Compare* Mich. Comp. Laws § 445.1576(5)(f) ("Growth or decline of the population and the number of new motor vehicle registrations in the relevant market area.") *with* § 747(d) ("[T]he demographic and geographic characteristics of the covered dealership's market territory.").

That leaves only a few factors that are unique to § 747, and each of those factors is easily explained by the different contexts of a run-of-the-mill franchise encroachment and the unprecedented and unique circumstances of a § 747 proceeding. First, § 747 explicitly considers the economic interest of the covered manufacturer, a consideration that would be unnecessary in the normal state protest proceeding, during which the court may presume that the manufacturer is acting in its best economic interest. Second, § 747 considers "the covered dealership's performance in relation to the criteria used . . . to terminate, not renew, not assume or not assign" the prior dealership agreement. § 747(d). This factor is unique to the terminated dealers covered under § 747 and totally irrelevant to any other prospective dealer. These slight differences do not make the inquiries so substantially different that the Michigan "good cause" determination is not effectively the same determination as a § 747 determination that a terminated dealer "should be added to the dealer network."

The analysis for the Nevada "good cause" inquiry is similar. Even though the Nevada statute is much sparser than Michigan's or the federal statute, it still covers many of the same general categories of factors and is on the whole similar in scope. That is, the statute requires the state official to consider the effect on "the business of selling new vehicles at retail in the relevant market area," the effect on the "welfare of the public," the present adequacy of services from other dealers, and whether the new franchise would "increase constructive competition and therefore be in the public interest." Nev. Rev. Stat. § 482.36358. The nature of the inquiry is

essentially the same as the inquiry under § 747, arriving at the same normative judgment by analyzing various demographic, geographic, and economic factors related to the relevant market area, the petitioning dealer, and the existing dealers. The only meaningful difference is that the Nevada statutes explicitly require the state official to "consider the economic effect of the proposed action upon the protesting dealer." *Id.* § 482.36363(2). However, this represents only one additional factor that slightly shifts the emphasis of the inquiry; it does not change the essence of the inquiry, which is whether there is good cause to allow a substantial investment into the regional retail vehicle market.

The analyses are thus largely the same. The subtle differences, in both substance and phrasing, are explained predominantly by differences in emphasis and framing: (1) whereas the state dealer protest laws look at the future effect of the new (or relocating) dealer, the federal law looks at the historic characteristics of the old dealer; (2) the state statutes encompass two slightly different types of cases—the establishment of entirely new dealerships and the relocation of existing dealerships; and (3) the state statutes contemplate that the manufacturer will be making the case in favor of the new dealer location, while the federal statute presupposes (as it must) that the dealer and manufacturer are adversaries. Especially considering these contextual differences, the determination is at heart the same: whether the new dealership should be allowed to operate, or good cause exists for allowing it to do so.

One of Chrysler's primary arguments is that the state dealer protest laws and § 747 "serve entirely different purposes." But the underlying inquiry is the same. Even if the state dealer protest laws are designed to protect the interests of existing dealers, while § 747 is meant to remedy the negative effects of unwarranted dealership terminations, the general concerns are the same: should this new dealer be allowed to enter the market? Congress, consistent with the retrospective intent of the act, deliberately chose not to weigh very heavily the interests of existing dealers, who would have had no state-created rights at the time of termination anyway. Given the context, namely the petitioning of a new dealership for entry into a specified geographic region to sell certain specified line-makes, and the similarity of factors, as discussed above, the state and federal determinations are of the same kind. Accordingly, the differences

that Chrysler points out are not so great that the state laws are not an obstacle to the federal arbitration's effect.

This conclusion is compelled by the Supreme Court's decision in *Leslie Miller, Inc. v. Arkansas*, in which the Supreme Court held that an Arkansas regulation that operated in parallel to a federal regulation was preempted as it applied to contractors working for the United States Armed Forces. 352 U.S. 187 (1956). Both the state and federal regulations required contractors to be "responsible" as defined by statute, and the regulatory factors were substantially similar, albeit not identical, in their details. *See id.* at 188–89. The Court held that the Arkansas regulation was preempted as applied, because "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.* at 190. The Court has reaffirmed the general holding that "[a] State may not enforce licensing requirements which . . . give the State's licensing board a virtual power of review over the federal determination." *Sperry*, 373 U.S. at 385 (internal quotation marks omitted). *Accord North Dakota v. United States*, 495 U.S. 423, 435–36 n.7 (1990) (plurality opinion) (Stevens, J.); *United States v. Virginia*, 139 F.3d 984, 988 (4th Cir. 1998).

It could be argued that the Court's decision in *Leslie Miller* relied on the rationale of "immunity of the instruments of the United States from state control." *See Leslie Miller*, 352 U.S. at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)). In *North Dakota v. United States*, Justice Brennan criticized the majority's exclusive reliance on preclusionary principles: "The plurality's assertion that *Leslie Miller, Inc.*, was not decided on immunity grounds is inconsistent with that opinion's own analysis." 495 U.S. at 453 (Brennan, J., dissenting) (citation omitted).

In any event, the instant case, like inter-governmental immunity cases, involves how the federal government spends its funds. Indeed, our conclusion that the state protest law provisions are preempted is bolstered because Chrysler was categorized as a § 747 "covered manufacturer" due to the fact that "the United States Government ha[d] an ownership interest in it" and "the

Government ha[d] provided financial assistance" to it under TARP.  § 747(a)(1)(B).  We need not address today what our holding would be if this were not the case.

Our holding above that § 747 provides only the limited relief of a "customary and usual letter of intent" is fully consistent with congressional intent to preempt state law in this respect.[13] Preemption is not an additional remedy; rather, it ensures that the remedy is meaningful.  Thus, the idea that the letter of intent is a "limited remedy . . carefully crafted . . . not [to] conflict with the State Dealer Acts," 862 F. Supp. 2d at 682, misconstrues how the remedy and preemption issues are related.  Even if the letter-of-intent remedy does not explicitly conflict with state law, the state laws stand as an obstacle to the intended end goal of the remedy and thereby make the remedy less effective at providing meaningful relief to the dealers.  Chrysler's argument that "Section 747 and state establishment laws speak to wholly distinct phases of the establishment process," similarly misses the mark.  The end goal is establishment, and letters of intent may not, therefore, amount to an effective nullity.  To the extent the whole purpose of a letter of intent is to initiate and eventually arrive at establishment, state dealer laws diminish the effectiveness of letters of intent.

The preemption in this case moreover does not substantially interfere with state policies, since § 747 is generally consistent in purpose with the whole scheme of state dealer laws.  For instance, another aspect of the dealer laws, intended to supplement and reinforce the protest laws' protections for existing dealers, is that manufacturers cannot terminate existing dealers without "good cause."  *See* Mich. Comp. Laws § 445.1567 (requiring "good cause"); Nev. Rev. Stat. §§ 482.36352, .36355.  Section 747 was intended to ensure that these protections from no-good-cause termination had not been unduly circumvented by the bankruptcy court's rejection authorization.  For example, the § 747 arbitration can only be sought by "[a] covered dealership that was not lawfully terminated under applicable State law."  § 747(b).  The factors that the arbitrator must take into consideration parallel the factors relevant for the state-law determination of whether good cause exists to terminate a dealership, especially those related to the

---

[13]Indeed, Chrysler's own actions imply that the protest laws, or at least the interests of existing dealers in monopolizing their area, were not consistent with Congress's intent in passing § 747.  The original letters of intent that Chrysler provided following the arbitration provided Chrysler with the right to terminate the letter of intent whenever a protest was filed in response to the letter of intent.  However, after further consideration, Chrysler stated that "the spirit of the statute was if they prevailed in arbitration they had the opportunity of coming back into the network," and Chrysler eliminated this protest-triggered unilateral right of termination.

performance of the dealership prior to termination. *Compare* § 747(d), *with* Mich. Comp. Laws § 445.1567(2)–(3) *and* Nev. Rev. Stat. § 482.36355.

Not only can the purpose of § 747 be reconciled with the overall scheme of state dealer laws, but preemption at most marginally encroaches on state regulatory turf in this case. It is true that there is a stronger presumption against preemption when the area of regulation is "'"in a field which the States have traditionally occupied."'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). However, § 747 does not to any great extent interfere even with the state dealer protest scheme. The act here has an extremely limited effect, as it applies only to a limited class of dealers and is limited in temporal scope. Nor is this "a field which the States have traditionally occupied." Many states do not have protest laws like the ones at issue in this case, as Chrysler's witness conceded at trial. And this is not an area of exclusive state regulation; federal law has protected automobile dealers from termination by manufacturers without "good cause" since 1956, before many of the states passed their state dealer protest laws. *See* Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25 (1956).

At oral argument, Chrysler suggested that a Michigan constituency—although it was not clear whether it was the terminated dealers or some representative body of all dealerships—could have lobbied for a Michigan-specific protest-law abrogation in the final version of the bill. Chrysler's logic is that the absence of such a provision implies that there was no preemptive intent. This argument, first, relies on overly speculative counterfactuals about the possibility of assembling a strong and cohesive constituency that could lobby effectively on a state-by-state basis. But more importantly, the argument undermines itself with its own implicit assumption about the variety of state dealer protest laws. Rather, the variety of state dealer protest laws—ranging from no such law to Iowa's expansive encroachment laws[14]—weighs in favor of the law creating a general national policy, regardless of any one state's law. Were Michigan an odd outlier, then the absence of a Michigan-specific exception would be more meaningful. The

---

[14]Iowa law creates a cause of action for monetary damages whenever a new franchisee "has an adverse effect on the gross sales of the existing franchisee's outlet or location," with some exceptions. Iowa Code Ann. § 523H.6.

general policy applicable to all states is, however, to preempt state processes that serve to second-guess the federal determination, as explained above.

The legislative history of § 747 supports the operation of conflict preemption, because it shows that Congress intended to respond to dealership closings by retroactively reversing the effects of closing dealerships that were profitable and did not deserve to be closed. Thus, the failure to pass a law that perfectly parallels state dealer protest laws—which naturally emphasize the interests of existing dealers—is more reasonably understood as a deliberate choice. For example, by emphasizing that the bill targets "high-performing, historically profitable, and experienced automobile dealers with longstanding relationships with their customers," the conference report suggests that a return to the status quo or previous success is the desired goal for the prevailing dealers. *See* H.R. Rep. No. 111-366, at 942 (2009) (Conf. Rep.). The conference report makes no mention of the letter of intent, but does discuss a "dealer's request to be added to the . . . dealer network." *Id.* at 942−43. Statements of members of Congress also support the retroactive intent of the act. During consideration of the Consolidated Appropriations Act, one senator said that § 747 would give dealers "a fair shot at *getting back into business*." 155 Cong. Rec. S13,128 (2009) (statement of Sen. Barbara Mikulski). During debate and questioning, the chairman of the committee that reviewed the bill characterized "the primary intent of th[e] provision [as] to ensure that covered dealerships have a fair and impartial *review of the termination decision*." *Id.* at S13,130 (statement of Sen. Dick Durbin).

The history of the legislation, namely the related bills that were introduced but never passed through both houses of Congress, *see* n.3, *supra*, does not suggest a limitation on § 747's scope, as suggested by Chrysler. Chrysler reasons that "legislators had considered, but declined to enact, more sweeping legislation" and that the legislative history demonstrates a "legislative compromise" that "provides rejected dealers the right to enter the network on the same terms as ordinary course dealer candidates." In turn, Chrysler argues that because the statutory "framework requires Chrysler Group to treat prevailing rejected dealerships just like any other dealer candidate," those prevailing dealers must "engage in the same [state] process as must any other Dealer Candidate." The specific conclusion does not appear to follow from the given premise, and in any event, we would be on treacherous ground to derive congressional intent

from the contrasting content of unenacted bills because they "are not reliable indicators of congressional intent." *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989).

Accordingly, § 747 preempts the operation of Michigan and Nevada dealer protest laws, which would authorize state officials to review the federal arbitral decisions.

## IV.

Third, contrary to Fred Martin's argument,[15] § 747 does not violate the separation of powers doctrine and is, therefore, constitutionally sound.

As an initial matter, Fred Martin has standing to raise the constitutional issue. The increase in direct competition caused by the possible entrance of Spitzer Autoworld, as mandated by the § 747 arbitration, causes Fred Martin a cognizable economic injury. "The Court routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement]." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (internal quotation marks and citation omitted). Once that injury is established, it is clear that the arbitration causes the injury. Finally, holding § 747 to be unconstitutional would redress the injury by nullifying the arbitration decision. Therefore, Fred Martin asserts all three requirements for constitutional standing—injury in fact, causation and redressability—set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The act does not violate the separation of powers doctrine because § 747 does not interfere with a final court judgment. Section 747 neither nullifies nor reopens a prior court order; rather, it simply reverses the effects of a court order through prospective relief. Though the integrity of the "Judicial Power of the United States" established in Article III of the Constitution forbids congressional or executive interference with the final judgments of courts, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 223−24 (1995), it does not forbid the granting of prospective relief intended to mitigate the perceived negative effects of a court order. That distinction follows logically from the Supreme Court's exposition of *Plaut*'s scope with respect to injunctions: "*Plaut* . . . was careful to distinguish the situation before the Court in that case—

---

[15]Because we accept Chrysler's interpretation of the remedy, namely that the statute's sole and exclusive remedy is a letter of intent, we need not address Chrysler's constitutional avoidance argument, which solely focused on the scope of the remedy. We therefore do not address the Bankruptcy Uniformity Clause, which is addressed on this appeal only with respect to constitutional avoidance.

legislation that attempted to reopen the dismissal of a suit seeking money damages—from legislation that 'altered the prospective effect of injunctions entered by Article III courts.'" *Miller v. French*, 530 U.S. 327, 344 (2000) (quoting *Plaut*, 514 U.S. at 232).

**V.**

Finally, four of the prevailing dealers challenge the district court's determination that they received a "customary and usual letter of intent."  For the most part, the district court correctly rejected these claims.  However, we do not apply the extraordinarily restrictive standard employed by the district court, which defined "customary and usual" provisions as those that are "substantially the same [a]s found in a majority" of the letters offered "to dealers who were given the opportunity to be added as new franchisees to the dealer network . . . , both in the ordinary course of New Chrysler's dealer network activities and to arbitrating dealers" from June 9, 2009 to July 31, 2010.  *Chrysler Grp.*, 2013 WL 3817408, at \*7.  Including in the "relevant universe" the letters of intent issued to prevailing dealers under § 747 without considering whether certain terms render the promise of a sales and service agreement illusory, would distort the statutory meaning of "customary and usual letter of intent" and undermine the effectiveness of the remedy that Congress provided to prevailing dealers.

First, because there is very little that is "usual" about the letters of intent issued by Chrysler in accordance with a § 747 arbitration, the proper set of letters of intent used to ascertain what is "customary and usual" should not include those required by a § 747 arbitration. A typical letter of intent follows a lengthy process of strategizing, negotiating, and vetting, after which Chrysler has almost no reservations committing to a sales and service agreement.  An ordinary, run-of-the mill dealership installation does not occur at the behest of the federal government after a politically contentious government buyout of the industry following a global financial calamity.  In short, Chrysler would not usually or customarily issue a letter of intent to a dealership that it did not want to enter its dealer network.

This approach finds some support from the Ninth Circuit, which limited the "relevant universe" to "the terms of [letters of intent] that new Chrysler dealers actually agreed to," in order to preclude the hypothetical possibility that a covered manufacturer could "nullify an arbitrator's order by offering onerous terms in initial [letters of intent] and then selectively

negotiating more advantageous terms only with dealers it chooses." *Los Feliz Ford*, 571 F. App'x at 548. The Second Circuit similarly suggested that the proper set of letters of intent for comparison purposes are those "issued by Chrysler in the ordinary and voluntary course of business." *Eagle Auto Mall*, 550 F. App'x at 70.

Further, the letters of intent must constitute a meaningful intention to enter into a full sales and service agreement, rather than a merely illusory promise that may not materialize for arbitrary reasons. To this end, a genuine letter of intent may not contain provisions that are unreasonably onerous or that grant Chrysler broad discretion to back out. This is consistent with decisions of other courts that have considered the issue, which have held that "Chrysler cannot frustrate the purpose of Section 747 by offering dealers who prevailed in arbitration 'unusual and onerous' terms." *Eagle Auto Mall Corp. v. Chrysler Grp., LLC*, 2012 WL 4579375, at *2 (E.D.N.Y. Sept. 28, 2012), *aff'd* 550 F. App'x 69 (2d Cir. 2014) (quoting *Los Feliz Ford, Inc. v. Chrysler Grp., LLC*, 10-cv-6077 (C.D. Cal. Apr. 9, 2012) (slip op. at 14)); *see also Los Feliz Ford*, 571 F. App'x at 548.

However, notwithstanding how the district court defined the "relevant universe" of letters of intent, there is reversible error only with respect to one provision in one of the letters of intent that are challenged on this appeal.

**A.**

Fox Hill, Village, and Jim Marsh argue that there should be a new trial solely because the "relevant universe" was not defined correctly. Because they make no effort to show how changing the "relevant universe" would affect the application of the customary and usual standard to their letters of intent, their argument fails.

The customary and usual standard serves to ensure that each letter of intent affords the prevailing dealership a substantial and meaningful remedy, a remedy not rendered illusory by the inclusion of onerous provisions or conditions that a voluntarily entered into contract would not contain. Fox Hill, Village, and Jim Marsh argue that, by limiting the "relevant universe," the district court effectively guaranteed a finding that their letters of intent were customary and usual. Yet Fox Hill, Village, and Jim Marsh have failed to identify—before the district court or

on appeal—a single burdensome provision in their respective letters of intent that, if reviewed against a different "relevant universe," would not be considered "customary and usual." Even after Chrysler highlighted their failure to identify how an alternative universe would have changed the trial outcome, Fox Hill, Village, and Jim Marsh did not address the deficiency in their reply brief. Absent such a showing, there is no basis for overturning the district court's finding that their letters were customary and usual.

**B.**

Livonia's challenge to the site-approval provision in its letter of intent, however, has merit because the site-approval provision, as applied to Livonia, may not be customary and usual. Because Livonia already had a successful dealership at its intended location, that location may be effectively pre-approved. To grant Chrysler a veto could render the promise of a dealership merely illusory and undermine Congress's intent to provide prevailing dealers with meaningful relief. Because Livonia's site-approval provision may not be permissible under § 747's "customary and usual letter of intent" standard, the district court's judgment with respect to that provision in Livonia's letter of intent must be reversed for further proceedings.

The provision in dispute requires Livonia to submit a site proposal to Chrysler for approval; should Chrysler reject the proposal, the letter of intent is nullified. However, it was clear throughout the arbitration that Livonia would be operating in the same location at the same facility it had operated before termination. The arbitrator considered Livonia's location at 30777 Plymouth Road in Livonia, Michigan, and the letter of intent was sent to Livonia at 30777 Plymouth Road. The arbitrator noted that Livonia intends to operate in the same location and out of the same facility it was running profitably before. Furthermore, the arbitrator reasoned that "[t]he difference to the consumer of the location of [a nearby existing dealer] versus [Livonia] likely lacks meaningful significance to the public." Under these circumstances, it appears unreasonable to expect a terminated dealer that was operating profitably before and still maintains control of the original premises of the dealership to obtain approval to operate a dealership at the same site. Even if, as alleged by Chrysler, a majority of letters of intent contain a site-approval requirement, Chrysler has not provided any reason why a dealership in Livonia's

peculiar situation would not be pre-approved.  By possibly granting Chrysler an effective veto, the site-approval provision may render the letter of intent merely illusory.

Livonia further challenges the site-control and exclusivity provisions in the letter of intent, arguing that because such provisions are not provided for a majority of dealerships, they are not customary and usual.  However, because such provisions are customary and usual for dealerships in Livonia's position, namely a dealership located in a suburban or metropolitan market, they do not require reversal.

The site-control option, paragraph 8(H) of Livonia's letter of intent, requires Livonia to provide Chrysler Group Realty Company LLC an option to lease or purchase the dealership facility.  This option would only be triggered by particular events, presumably the termination of the sales and service agreement.  Chrysler justifies waiving this provision for rural dealerships, because "rural markets have an abundance of land and locations" at which Chrysler could operate another dealership, at least as compared to "metropolitan and secondary markets."  This appears to be a reasonable justification because, as Chrysler's witness explained at trial, suburban auto malls tend to be very crowded, with little vacant space available in which to construct a new facility in an optimally competitive location.  Because Chrysler has provided a reasonable justification for discriminating between rural markets on one hand and suburban markets on the other, and 85 percent of letters of intent that were issued to dealerships in metropolitan and suburban markets required a site-control option, the provision was customary and usual as applied to Livonia.

Similarly, the exclusivity requirement is customary and usual as applied to Livonia because it is in a suburban market area.  Livonia's letter of intent requires Livonia to "provide a facility . . . for the *exclusive* display, sales and service of the Chrysler and Jeep vehicle lines." (emphasis added).  Chrysler's witness explained at trial that dealers in rural markets may not maintain sufficient sales volumes to sustain a facility that sells vehicles of only one manufacturer.  Thus, Chrysler waived the exclusivity requirement for many of its rural dealerships.  However, even including the rural dealerships, most of the letters of intent contained an exclusivity requirement, and every single one of the non-rural dealerships were

required to be exclusive.  This provision is also customary and usual as applied to Livonia, and therefore does not require reversal.

## VI.

For the foregoing reasons, we REVERSE and REMAND in Nos. 13-2117 and 13-2118 so that the district court may enter a declaratory judgment consistent with this opinion to the effect that the state dealer protest laws in Michigan and Nevada are preempted.  With respect to No. 13-2117, we AFFIRM the district court's judgment dismissing the counter-claims of Fox Hills, Village, and Jim Marsh that alleged that they did not receive customary and usual letters of intent.  With respect to appeal No. 13-2118, however, we VACATE the judgment of the district court dismissing Livonia's claim and REMAND for reconsideration of whether Livonia's letter of intent is customary and usual, in proceedings consistent with this opinion.  With respect to appeal No. 13-2119, we AFFIRM the district court's judgment.